UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

RACEY FORD                                                                      CIVIL ACTION

VERSUS

STATE OF LOUISIANA, ET AL                                          NO. 08-361-C-M2

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, May 21, 2009.

_____
**MAGISTRATE JUDGE CHRISTINE NOLAND**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **RACEY FORD** | **CIVIL ACTION** |
| **VERSUS** | |
| **STATE OF LOUISIANA, ET AL** | **NO. 08-361-C-M2** |

**MAGISTRATE JUDGE'S REPORT**

This matter is before the Court on the Original and Amended Petitions for Writ of Habeas Corpus (R. Docs. 1 and 3) filed by petitioner, Racey Ford ("Ford"). The State of Louisiana ("the State") has filed an opposition (R. Doc. 18) to Ford's petitions.

**PROCEDURAL BACKGROUND**

Ford pled guilty on June 13, 2000 in the 21st Judicial District Court, Parish of Livingston, State of Louisiana, to two (2) counts of simple burglary of an inhabited dwelling in violation of La. R.S. 14:62.2 and one (1) count of felon in possession of a firearm in violation of La. R.S. 14:95.1. He also pled guilty to another count of simple burglary of an inhabited dwelling under a separate docket number. He was subsequently sentenced to twelve (12) years imprisonment at hard labor on each burglary, with the first year being served without the benefit of probation, parole, or suspension of sentence. Ford was also sentenced to ten (10) years imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence, on the firearm charge. His sentences were to run concurrently, and he was given credit for all time previously served.

During the hearing on June 13, 2000 when Ford pled guilty to the above charges, the trial court advised him that, by entering his guilty plea, he could be billed as a habitual offender, and the State indicated, at that time, that it planned to file a habitual offender bill

1

of information against Ford. It was further suggested at the plea hearing on the original charges that, if Ford pled guilty to the multiple offender bill, he would receive a twenty-four (24) year sentence at hard labor to run concurrently with his sentences on the above, original charges. Prior to his arraignment on the multiple offender bill, however, Ford decided not to plead guilty on that bill, and the matter therefore proceeded to a hearing on April 18, 2001. At that time, Ford was adjudicated a second felony offender. His twelve (12) year sentence on the first count of simple burglary of an inhabited dwelling was vacated, and Ford was resentenced to twenty-four (24) years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on Count One, with that sentence running consecutively to his other sentences on the original charges.

On June 5, 2002, Ford filed an application for post-conviction relief in the state district court.[1] Although there is no trial court judgment denying Ford's post-conviction relief application within the state court record provided to the Court, it is apparent that such application was denied by the state trial court based upon information contained in other documents within the record.[2] While the record contains a copy of a writ application by Ford to the First Circuit Court of Appeals concerning the denial of his post-conviction relief

---

[1] In that application, Ford raised the following issues: (1) He requested specific performance of the "guilty plea agreement" because the State failed to keep its promise with regard to his sentence; (2) ineffective assistance of counsel during his guilty plea and multi-bill proceedings; (3) that his sentence was illegal or excessive since the "predicate offense could not be used to enhance the immediate sentence;" (4) his guilty plea was not voluntarily and intelligently entered where neither counsel nor the court informed him of the nature and consequences of the charges against him; and (5) the multi-bill proceedings were in violation of his constitutional right to due process and in violation of La. R.S. 15:529.1 because he received no "prior" notice of the proceedings or of the predicate offenses the State intended to use as a basis for his sentence.

[2] The trial judge denied Ford's request to file a traversal to the State's answer to his post-conviction relief application on October 9, 2002 on the ground that it was moot because the trial judge had "previously denied petitioner's post-conviction relief without the necessity of a contradictory hearing." Ford also states in his writ application to the First Circuit that the trial court denied his post-conviction relief application prior to the State even filing an answer thereto.

application, that copy is not file-stamped so the Court is uncertain whether that application was ever actually filed with the First Circuit. Furthermore, there is no evidence in the record that Ford sought writs from the Louisiana Supreme Court relative to his June 5, 2002 post-conviction relief application.

On January 3, 2003, however, Ford filed a second application for post-conviction relief in the state district court raising identical claims to those asserted in his June 5, 2002 application. His second post-conviction relief application was also denied by the state district court. Ford applied for writs to the Louisiana First Circuit Court of Appeals and the Louisiana Supreme Court, which were denied on February 10, 2003 and March 26, 2004 respectively.[3]

On June 17, 2008, Ford filed his habeas petition in this matter. He subsequently filed an amended habeas petition on July 8, 2008 because his original petition was not on the proper forms. In both his original and amended habeas petitions, he set forth the following claims: (1) ineffective assistance of counsel during guilty plea proceedings; (2) denial of the right to withdraw his guilty plea after petitioner realized that he was not going

---

[3] On January 10, 2006, Ford filed a motion to correct illegal sentence, wherein he contended that his sentence should be modified because the sentencing judge erred in imposing more than one sentence during his habitual offender proceedings. That motion was denied by the state trial court on January 11, 2006. On May 14, 2007, Ford filed an amended and supplemental petition for post-conviction relief that was denied by the state district court as untimely. The record does not reflect that Ford sought writs relative to that denial.

On February 4, 2008, Ford filed another motion to correct illegal sentence in the state district court on the ground that the trial court denied him the right to withdraw his guilty plea and because his counsel was ineffective during the habitual offender proceedings. That motion was denied by the trial court on February 13, 2008. Ford sought writs to the Louisiana First Circuit Court of Appeals, which were denied on June 6, 2008. On June 17, 2008, Ford filed a "Notice of Appeal" in the state court record, providing notice that he was appealing to the Louisiana Supreme Court from the First Circuit's June 6, 2008 writ denial; however, there is no evidence in the record that Ford ever filed that appeal/writ application with the Louisiana Supreme Court, and if he did, that the Louisiana Supreme Court has ruled on it. Furthermore, Ford indicated in his federal habeas petition that, although he tried to file a writ application concerning his motion to correct illegal sentence with the Louisiana Supreme Court, it was "sent [ ] back unfiled."

to receive the sentence promised him under the plea agreement; (3) denial of the right to a trial by judge or jury; (4) his guilty plea was not knowing and intelligent because he was misinformed during plea negotiations concerning the sentence he would receive; and (5) his sentence, which is a result of a broken plea agreement and a violation of his constitutional rights, is illegal and excessive.

On September 18, 2008, the State filed a motion to dismiss Ford's original and amended habeas petitions with prejudice (R. Doc. 8) on the ground that he failed to exhaust his state court remedies relative to the claims asserted therein. The undersigned issued a Report and Recommendation (R. Doc. 13) relative to that motion on November 3, 2008, wherein it was determined that all but one of Ford's habeas claims had been properly exhausted through the state court system. Specifically, the undersigned found that the only claim Ford had not exhausted was Claim #3 concerning the alleged denial of his right to trial by judge or jury, and it was recommended that such claim be dismissed. On December 5, 2008, the district judge adopted the undersigned's recommendation (R. Doc. 14), dismissing Ford's Claim #3 with prejudice and ordering the State to file a response to the merits of all of Ford's remaining claims within thirty (30) days. The State filed such response (R. Doc. 18) on January 27, 2009. The undersigned now addresses the State's response in the present report.

## **LAW & ANALYSIS**

In order for this Court to grant an application for a writ of habeas corpus as to any claim which has been previously adjudicated on the merits in state court, the Court must find that adjudication of such claim: (1) resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States; or (2) resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (d)(2). In addition, determinations of factual issues made by state courts shall be presumed correct, unless particular statutory exceptions to 28 U.S.C. § 2254(d) are implicated, and the applicant has the burden of rebutting that "presumption of correctness" by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994).

**I.     Claim #1: Did Ford receive ineffective assistance of counsel during his guilty plea proceedings?**

**(A)     Applicable Legal Standard:**

A habeas petitioner seeking to prove ineffective assistance of counsel must meet the two-pronged burden of proof set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must affirmatively demonstrate:

(1)     that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

(2)     that the deficient performance "prejudiced" his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial where the result is reliable.

*Strickland*, 104 S.Ct. at 2064.[4]

---

[4] To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. See *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988). The court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Martin*, 796 F.2d at 817. Great deference is given to counsel's exercise of his professional judgment. *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816. When it is apparent that the alleged incompetent acts of the attorney were in fact conscious strategic or tactical trial decisions, review of the acts must be "highly deferential." *Kimmelman v. Morrison*,

**(B)  Analysis in present case:**

In his original and amended habeas petitions, Ford contends that he received ineffective assistance of counsel during his guilty plea proceedings because his attorney did not object when the trial judge misled him to believe he would receive "good time" under the multiple offender bill and that his original and multiple offender sentences would run concurrently, rather than consecutively. He alleges that, when those sentences were imposed to run consecutively, he tried to withdraw his guilty plea, but such attempt was denied by the state trial court.

In support of the above allegations, Ford first relies upon pages 16 and 17 of the transcript from his guilty plea proceedings. During that hearing, which occurred on June 13, 2000, Ford pled guilty to the original charges against him (*i.e.*, two counts of simple burglary and one court of felon in possession of a firearm), and the state trial court accepted his guilty plea as knowing and voluntary. The fact that the State planned to file a habitual offender bill against Ford was discussed at the hearing, and Ford indicated that he understood that he could receive a twenty-four (24) year sentence on the habitual

---

477 U.S. 365, 106 S.Ct. 2574, 2587 91 L.Ed.2d 305 (1986). Mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error has no effect on the judgment. *Strickland*, 104 S. Ct. at 2066.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must also affirmatively demonstrate prejudice from the alleged errors. *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland*, 104 S. Ct. at 2067. To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,104 S.Ct. at 2068. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Martin*, 796 F.2d at 816-17. A conscious and informed tactical decision cannot be the basis for constitutionally ineffective assistance of counsel unless it is "so ill-chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F. 2d 199, 206 (5th Cir. 1982).

offender bill. On pages 16 and 17 of the hearing transcript, the trial judge noted, at the conclusion of the hearing after Ford had already entered his guilty plea on the original charges and such plea had been accepted by the court:

> THE COURT:    Mr. Ford, I remand you over to the custody of the sheriff. Mr. Ford, I don't know exactly how they are going to calculate this and ultimately if you wind up with a sentence of twenty-four years without benefit of parole, probation or suspension of sentence, I don't know if you would be under the eighty-five percent good time or the two for one good time . . .

*See*, June 13, 2000 Hearing Transcript, R. Doc. 1-2, pp. 16-17.

Ford contends that the single statement made by the trial judge concerning "good time" quoted above was sufficiently misleading that he received ineffective assistance of counsel because his counsel did not object to it. The Court disagrees. First, since such statement was not made by the trial judge until after Ford had already entered his guilty plea on the original charges and the plea had been accepted by the trial court, the statement had absolutely nothing to do with Ford's decision to plead guilty on the original charges against him. Furthermore, although Ford initially agreed to plead guilty to the habitual offender bill as part of his plea agreement on the original charges, he subsequently decided not to do so. Thus, any statement the state trial judge made concerning "good time" under a guilty plea on the habitual offender bill was harmless and did not cause Ford to enter a guilty plea on such bill. Accordingly, Ford's counsel was not deficient in failing to object to the state trial judge's comment concerning "good time" nor was such comment prejudicial to Ford.

In support of this claim, Ford also relies upon pages 12 and 13 of the April 18, 2001 hearing transcript (R. Doc. 1-2) relating to the State's multiple offender bill. Ford contends

7

that such pages indicate that he tried to withdraw his guilty plea on the habitual offender bill after it was entered. Those pages reflect the following exchange between the state trial judge and the prosecutor:

> THE COURT:     As I appreciate it, wasn't this a plea?
>
> THE STATE:     It was a plea, Your Honor. And then we canceled the arraignment, and he withdrew his plea, so that's why we did the hearing today.
>
> The agreement was supposed to be 24 years on the Habitual Offender Bill, but Mr. Ford withdrew that when it came time for the arraignment on the Habitual Offender Bill which necessitated the hearing this morning.

*See*, April 18, 2001 Hearing Transcript, R. Doc. 1-2, pp. 12-13. The above exchange indicates, contrary to Ford's contentions, that he never, in fact, formally entered a guilty plea on the habitual offender bill, and that is why the matter proceeded to a hearing on April 18, 2001. Thus, the exchange further confirms the Court's above finding that the state trial judge's isolated comment concerning "good time" on June 13, 2000 did not cause Ford to enter a guilty plea on the habitual offender bill that Ford was later prevented from withdrawing.

Additionally, in the context of this claim, Ford does not refer to any specific factual or evidentiary support for his allegation that he was misled into believing that his original and habitual offender sentences would run concurrently, rather than consecutively. Furthermore, any comments made to Ford regarding the concurrent or consecutive nature of those sentences if he were to plead guilty on the habitual offender bill were rendered

meaningless when Ford decided not to enter a guilty plea on the habitual offender bill.[5] Accordingly, his attorney was not ineffective in either misleading Ford as to the nature of the sentence he would receive if he pled guilty to the habitual offender bill and/or in failing to object to any comments the state trial judge made in that regard.

Finally, to the extent Ford is claiming that his counsel was ineffective in recommending that he plead guilty to the original charges against him, the Court agrees with the State that such a claim lacks merit. Had petitioner not pled guilty to the original charges and instead if he had proceeded to a trial that resulted in his conviction, he could have been facing the maximum sentences on all of the original charges and could have been sentenced to serve the entirety of those sentences without the benefit of parole, probation or suspension of sentence. By comparison, under his guilty plea on the original charges, he was to serve only one year of his sentences on the simple burglary charges without the benefit of parole, probation or suspension of sentence. Furthermore, if he had been found guilty at trial, the trial judge could have run all of his sentences on the original charges consecutively, rather than concurrently. Considering those benefits to pleading guilty on the original charges, Ford's counsel was not unreasonable in recommending that petitioner enter a plea of guilty to those charges. For all of the above reasons, the Court finds that the state trial judge's denial of Ford's ineffective assistance of counsel claim in

---

[5] "Plea bargain agreements are contractual in nature, and are to be construed accordingly." *U.S. v. Moulder*, 141 F.3d 568 (5th Cir. 1998), quoting *Hentz v. Hargett*, 71 F.3d 1169, 1173 (5th Cir.), *cert. denied*, 517 U.S. 1225, 116 S.Ct. 1858, 134 L.Ed.2d 957 (1996). If a defendant materially breaches his commitments under a plea agreement, the government is released from its obligations under that compact. *U.S. v. Ballis*, 28 F.3d 1399 (5th Cir. 1994); *State v. Caballero*, 464 So.2d 939 (La. App. 4 Cir. 1985). Thus, when Ford decided not to enter a plea of guilty on the multiple offender bill, the State and the state trial court were not required to carry out any obligations relative to Ford's habitual offender sentence, including any alleged promise that his habitual offender sentence would run concurrently with his original sentences.

his post-conviction relief application was not contrary to, or an unreasonable application of, the clearly established federal law set forth in *Strickland v. Washington*, nor did it result from an unreasonable determination of the facts in light of the evidence, and this claim should therefore be denied.

**II.     Claim No. 2:  Was Ford denied the right to withdraw his guilty plea?**

In this claim, Ford contends that he was denied his constitutional right to withdraw his guilty plea.  He asserts that, during the June 13, 2000 hearing wherein he entered a plea of guilty to the original charges, he was promised that his multiple offender sentence would run concurrently with his original sentences, rather than consecutively.  He further contends that, when he realized that promise was not going to be fulfilled, he was denied the opportunity to withdraw his guilty plea.  In support of such contentions, he relies upon pages 9-10 of the June 13, 2000 hearing transcript, where the following exchange occurred:

> THE COURT:    Have you been promised any leniency if you plead guilty to this charge [the original charges]:
>
> DEFENSE:      Your Honor, he has been promised – with the understanding that the sentences will run concurrent, Your Honor.
>
> THE COURT:    It is also my understanding that there was some discussion that the State would in all probability bill you as a habitual offender and that part and parcel of this plea is a sentencing agreement that this court would sentence you to twenty-four years on that multiple offender bill.
>
> DEFENSE:      It is our understanding, Your Honor, that the enhancement of the sentence would be no more than twelve years on the concurrent sentences he is receiving here today based on the multiple bill.

> STATE: Right. He would plea to these [original] charges today and get the maximum sentence of twelve years[.] Then the state would file a habitual offender appeal against him which based on the twelve year sentence [on the original charges], would give him a twenty-four [year] sentence on a [habitual offender] bill.
>
> THE COURT: Is that your understanding, Mr. Ford?
>
> MR. FORD: Yes, Sir.

*See*, June 13, 2000 Hearing Transcript, R. Doc. 1-2, pp. 9-10.

Based upon the above exchange, it certainly appears that Ford understood that his sentences on the original charges, to which he pled guilty during the June 13, 2000 hearing, were to run concurrently. However, it is not clear whether, at that time, he or his counsel believed that the sentence that would be imposed under the habitual offender bill, if he pled guilty to such bill, would run concurrent with his original sentences. Regardless, given Ford's subsequent decision not to enter a plea of guilty on the habitual offender bill,[6] any understanding that he or his counsel had as to whether his sentence under such a plea would run concurrent with his sentence on the original charges became irrelevant.[7] Moreover, since Ford decided not to enter a guilty plea on the habitual offender bill, there

---

[6] *See*, April 18, 2001 Hearing Transcript, R. Doc. 1-2, pp. 12-13 (regarding the fact that Ford was supposed to plead guilty on the habitual offender bill and then changed his mind, necessitating a hearing to determine whether he was, in fact, a habitual offender, and if so, to impose a sentence based upon that status).

[7] Federal habeas relief is only awardable in situations involving plea agreements when an "actual promise" has been made to the petitioner, not merely when there is an "understanding" on his part as to the nature of the agreement. *Davis v. Butler*, 825 F.2d 892 (5th Cir. 1987). Ford has not referred the Court to any evidence wherein the prosecution or the state trial judge made an "actual promise" to him that he would receive "good time" under his habitual offender sentence and/or that his sentences on the original charges and the habitual offender bill would run concurrently; he has only alleged that such was his understanding, which is insufficient to warrant habeas relief.

was no plea agreement relative to that bill for him to withdraw; thus, he could not have been denied his constitutional right to do so.

Furthermore, there is no evidence in the record that Ford ever attempted to withdraw his guilty plea on the original charges entered on June 13, 2000; accordingly, he could not have been denied his constitutional right to withdraw that guilty plea. Even if he had attempted to withdraw that guilty plea, the Court finds no basis under which he could have done so, as the June 13, 2000 hearing transcript reflects that such plea was entered knowingly and voluntarily. *See*, Discussion in Section III of this report. Accordingly, this claim should therefore also be dismissed.

**III.    Claim No. 4:  Was Ford's guilty plea knowingly and intelligently made?**

In this claim, Ford contends that his guilty plea was not knowingly and intelligently made because the state trial judge misled him by saying that he could receive "good time" when it is not allowed under a habitual offender bill and because he was led to believe that his sentences on the original charges and the habitual offender bill would run concurrently. As discussed above, the Court does not find that the state trial judge's single statement at the conclusion of the plea hearing on June 13, 2000 had any impact upon Ford's decision to plead guilty to the original charges. Such statement was made after the nature of the original charges and the sentences on those charges had been fully explained to Ford, after Ford indicated that he understood same, after Ford indicated that he had not been promised anything (other than that his original sentences would run concurrently) in exchange for entering his guilty plea, and after the state trial judge had accepted Ford's

guilty plea on the original charges as knowing and voluntary.[8] The fact that the state trial judge was unclear as to what, if any, type of "good time" Ford might receive under his sentences simply does not render the previously-entered guilty plea unknowing or involuntary. As mentioned above, the record does not indicate that Ford ever attempted to withdraw his guilty plea on the original charges; thus, there is no evidence to suggest that he wished to proceed to trial on those charges as a result of the state trial judge's isolated comment concerning "good time."

---

[8] In *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, 279 (1969), the U.S. Supreme Court explained that a guilty plea is more than a confession which admits that the accused did various acts. Such a plea is itself a conviction, and nothing remains but to give judgment and determine punishment. *Id.*, at 242. The seriousness of a guilty plea therefore mandates that it "not only must be voluntary but must be [a] knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances." *Gilliard v. Scroggy*, 847 F.2d 1141, 1143 (5th Cir. 1988), quoting *Grantling v. Balkcom*, 632 F.2d 1261, 1264 (5th Cir. 1980)(quoting *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747, 756 (1970)). To satisfy due process, the state trial judge must, at a minimum, inform the defendant of the critical elements of the crime to ensure that he receives "'real notice of the true nature of the charge against him.'" *Gilliard*, at 1143, quoting *Henderson v. Morgan*, 426 U.S. 637, 645, 96 S.Ct. 2253, 2257, 49 L.Ed.2d 108, 114 (1976).

During the plea hearing on June 13, 2000, the state trial judge explained to Ford each of the charges against him by reading the applicable statutes to him. He also informed Ford of the potential sentences that could be imposed upon him for each of those charges. Ford specifically indicated that he understood the charges against him and the possible penalties if he pled guilty or was found guilty at trial. The state trial judge also informed Ford of the various rights he would be foregoing by pleading guilty, *i.e.*, his absolute right to plead not guilty, the fact that the burden of proof would rest on the State at trial to prove each and every element of the offenses of which he was charged beyond a reasonable doubt, the right to a trial by jury, the right to confront his accusers and to cross-examine them, the right to remain silent and not testify against himself, the right to compel the attendance of witnesses to testify on his behalf at trial, and the right to appeal his conviction if he was found guilty at trial. Ford indicated that he understood all of those rights as well as the fact that he was waiving them by pleading guilty. The state trial judge then discussed each of the charges against Ford and asked him to admit that he committed each offense, which he did. Ford also admitted that he was a prior convicted felon. Defense counsel indicated that Ford had not been promised any leniency in exchange for pleading guilty to the original charges, other than the fact that the sentences on those charges would run concurrently. Defense counsel further indicated that he had advised the accused of the nature of the charges against him and of his legal and constitutional rights and that he believed Ford understood that advice. The trial judge asked Ford if he had any other questions he would like to ask the court, the district attorney, or defense counsel, to which Ford responded, "No, sir." Ford also indicated that he was satisfied with the legal representation he had received from defense counsel. At that point, the trial court concluded that Ford's guilty plea relative to the original charges was "voluntarily, knowingly and intelligently made," and it was accepted by the trial court. This Court agrees with the state trial judge's conclusion. If either Ford or his attorney was unclear on the issue of whether petitioner's original and habitual offender sentences were to run concurrently, the opportunity was certainly available to them at the plea hearing to ask questions in that regard, but they did not do so.

As to Ford's claim that his guilty plea was not knowing and voluntary because he was led to believe that his original sentences would run concurrent with his habitual offender sentence, the Court again notes that pages 9-10 of the June 13, 2000 hearing transcript do not clearly reflect that, at the time of that hearing, Ford understood that his sentences on the original charges and his habitual offender sentence were to run concurrently. The only definitive understanding that can be gleaned from those pages is that petitioner understood that his sentences on the original charges were to run concurrently. Moreover, as mentioned above, any understanding Ford may have had as to whether his sentences on the original charges would run concurrent with his habitual offender sentence, if he pled guilty to the habitual offender bill, became irrelevant once he decided not to enter a plea of guilty with respect to the habitual offender bill, and such understanding therefore would not be grounds for allowing Ford to withdraw his previously-entered guilty plea on the original charges. Accordingly, this claim should also be denied.

**IV.    Claim No. 5:  Did Ford receive an illegal and excessive sentence in violation of his constitutional rights?**

In this claim, Ford contends that he is being held by the State of Louisiana under an illegal and excessive sentence resulting from the fact that his sentences do not comport with what he was promised during the June 13, 2000 plea hearing. Under federal law, a sentence is only considered to be so excessive as to be cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution when it is "so greatly disproportionate to the offense committed as to be completely arbitrary and shocking to the sense of justice." *Rummel v. Estelle*, 587 F.2d 651, 655 (5th Cir. 1978); *Hawkins v. Hargett*, 200 F.3d 1279, 1281 (10th Cir. 1999)(citing *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct.

2680, 115 L.Ed.2d 836 (1991)(The Supreme Court has held that the Eighth Amendment prohibits a sentence disproportionate to the severity of the crime); *U.S. v. Gonzales*, 121 F.3d 928 (5th Cir. 1997).[9] In determining the proportionality of particular sentences, for purposes of an Eighth Amendment excessive sentence claim, courts should grant substantial deference to the broad legislative authority in determining punishments and limits for crimes, as well as to the discretion that trial courts possess during sentencing. *Raff v. Stewart*, 2001 WL 180823 (9th Cir. 2001), citing *Solem v. Helm*, 463 U.S. 277, 289-90, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Outside the context of capital punishment, successful challenges to the proportionality of particular sentences are exceedingly rare. *Solem*, at 290. Only extreme sentences that are "grossly disproportionate" to the crime violate the Eighth Amendment. *United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992).

During the June 13, 2000 plea hearing in this matter, Ford admitted to committing three (3) counts of residential burglary and one (1) count of possessing a firearm as a convicted felon. The state trial judge specifically explained to him during the hearing that, on the simple burglary charges, he would receive a sentence of imprisonment at hard labor for not less than one (1) year without the benefit of parole, probation or suspension of sentence and not more than twelve (12) years, and on the firearm charge, he would receive imprisonment at hard labor for not less than ten (10) nor more than fifteen (15) years without the benefit of probation, parole, or suspension of sentence and would be fined not less than $1,000.00 and not more than $5,000.00. As mentioned above, Ford was

---

[9] Similarly, Louisiana law provides that a sentence is unconstitutionally excessive when it is "nothing more than a purposeless and needless imposition of pain and suffering that is grossly out of proportion to the severity of the offense." *State v. James*, 2001-2292 (La. App. 1 Cir. 2002), 813 So.2d 659.

sentenced to twelve (12) years imprisonment at hard labor on the counts of burglary, with the first year being served without the benefit of probation, parole, or suspension of sentence, and ten (10) years imprisonment at hard labor on the firearm charge, without the benefit of probation, parole, or suspension of sentence for the entirety of the sentence. However, because those sentences were set to run concurrently, Ford's total sentence on those charges was twelve (12) years, which is hardly disproportionate considering the nature and number of crimes he committed.

Additionally, as discussed above, during the June 13, 2000 plea hearing, Ford was made aware of the fact that he could receive a twenty-four (24) year sentence on the habitual offender bill to be filed by the prosecution. *See*, June 13, 2000 Hearing Transcript, R. Doc. 1-2, p. 10. At the hearing on the habitual offender bill on April 18, 2001, the prosecution called a probation and parole officer, Dudley Aldridge, who testified that he had performed intake on Ford on November 16, 1993 after Ford had been sentenced for two (2) counts of simple burglary of an inhabited dwelling in Livingston Parish. Ford had pled guilty to those two (2) counts and had received two (2) consecutive sentences of twelve (12) years imprisonment, all of which had been suspended except for one (1) year, and Ford had been sentenced to five (5) years probation upon release. The prosecution also presented testimony by Aldridge and a representative from the State Police to identify that Ford was, in fact, the same person who had pled guilty to two (2) counts of simple burglary in 1993.

Based upon the evidence presented by the prosecution at the April 18, 2001 hearing, the trial court was satisfied that the State had proven all of the elements necessary to obtain a habitual offender status as to Ford as a second felony offender for purposes of

sentencing. The state trial judge then vacated the twelve (12) year sentence on Count 1 of simple burglary to which Ford had pled guilty on June 13, 2000 and imposed a twenty (24) year sentence without the benefit of probation, parole or suspension of sentence as to Count 1 based upon Ford's second felony offender status, with that sentence to run consecutively to the twelve (12) years imprisonment Ford had received on June 13, 2000 as to the remaining original charges (resulting in a total sentence of thirty-six (36) years). Considering Ford's previous sentences in 1993 for the same crimes for which he pled guilty in 2000, the Court does not find that the state trial judge's sentencing decision was "grossly disproportionate" to the severity of the crimes committed. It is clear that the minimal sentence Ford received in 1993 did not act as a sufficient deterrent to prevent him from committing the same crime again on multiple occasions. Moreover, since Ford decided not to enter a plea of guilty to the habitual offender bill in 2001, the trial court was not required to comply with any alleged promise that his habitual offender sentence would run concurrently with his sentences on the original charges.

In light of the substantial deference that is owed to the legislative authority in setting punishments for particular crimes and the discretion allowed state trial courts in determining appropriate sentences, the Court cannot say that the state trial judge's sentencing decision on the habitual offender bill was an abuse of his discretion. Furthermore, the trial judge's decision denying Ford's post-conviction relief claim seeking to have his sentence overturned as illegal and excessive was not contrary to, or an unreasonable application of, federal law nor was it based upon an unreasonable determination of the facts in light of the evidence. Accordingly, this claim should also be denied.

## RECOMMENDATION

For the above reasons, it is recommended that the Original and Amended Petitions for Writ of Habeas Corpus (R. Docs. 1 and 3) filed by petitioner, Racey Ford, should be **DISMISSED WITH PREJUDICE** for lack of merit.

Signed in chambers in Baton Rouge, Louisiana, May 21, 2009.

**MAGISTRATE JUDGE CHRISTINE NOLAND**